IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| NANETTE SMITH and | § | |
| CALIBER HOLDINGS LLC | § | |
| | § | |
| V. | § | C.A. No. _____ |
| | § | |
| THE LINCOLN NATIONAL | § | |
| LIFE INSURANCE COMPANY | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

NANETTE SMITH and CALIBER HOLDINGS LLC file this Original Complaint against The Lincoln National Life Insurance Company due to its wrongful denial of Mrs. Smith's Accidental Death and Dismemberment claim following the death of her husband, Freddie "Don" Smith, Jr.

### Parties

1.    Plaintiff, Nanette Smith, "(Smith"), is a resident citizen of Denton County, Texas.

2.    Plaintiff, Caliber Holdings LLC ("Caliber"), is a domestic limited liability company and resident citizen of Texas.

3.    Defendant, The Lincoln National Life Insurance Company ("Lincoln"), is a domestic or foreign insurance company doing business in various states including the State of Texas. It can be served through its registered agent, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701, or wherever it may be served.

### Jurisdiction and Venue

1

4.    This action against Lincoln arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001 *et seq*. This Court has jurisdiction over this action pursuant to 29 U.S.C. §1132(e)(1).

5.    Venue is proper in this District and Division pursuant to 29 U.S.C. §1132(e)(2) because Lincoln maintains business activity in and may be found in this District.

6.    Pursuant to 29 U.S.C. §1132(h), this Complaint has been served upon the Secretary of Labor, Pension and Welfare Benefits Administration, at 200 Constitution Avenue N.W., Washington, D.C. 20210 and the Secretary of the Treasury at 111 Constitution Avenue N.W., Washington, D.C. 20024, by certified mail return receipt requested.

## Statement of Facts

7.    Freddie Smith graduated high school in 1977 from Manor High outside Austin, TX. Instead of attending college, he took several technical courses to further his education and broaden his skills. He worked at Ford for 15 years before joining Caliber.

8.    While at Ford, he served as the Chairman of the Board for the Chamber of Commerce in Lewisville, TX.  In June 2022, he joined Caliber, where he remained until his untimely death in February 2023.

9.    Freddie excelled at Caliber. Although he was hired as a collision center manager, his job involved travel to any center or area that needed help. He went to Las Vegas weekly and served as a manager there for close to a year.  After that, he transferred back to the DFW area and served as the Director of Strategic Accounts.

10.    F

11.    Freddie won many awards and accolades at Caliber, including trips to Cancun, Cabo San Lucas, and Puerto Rico. He always wanted to do the best that he could at Caliber. He worked until the day of his death.

Health History

12.    Freddie was diagnosed with a hereditary blood disorder called Von Willenbrand when he was 12 years old. It did not prevent him from living his life, nor did it make him sick; he rarely had anything more than an occasional cold. As he aged, the Von Willenbrand symptoms subsided. Freddie never smoked and drank occasionally. He took the flu shot annually, had annual physical exams, and stayed busy at home.

13.    Freddie had triple bypass heart surgery in January 2013. He fully recovered.

14.    In August 2017, Freddie was diagnosed with stage 3 squamous cell carcinoma of the throat. He underwent 12 weeks of radiation and chemotherapy. Like any obstacle he faced in life, Freddie beat the cancer, and it went into remission.

15.    In 2022, Freddie started experiencing some dizziness. It was determined that the blood flow was restricted in his carotid arteries. His cardiologist and vascular surgeon determined Freddie needed a stent and surgery on the left carotid artery. Both surgeries were successfully performed in early April 2022. After a couple of weeks of recovery, Freddie did what he always did – he went back to work.

16.    In January 2023, Freddie went into the hospital for a heart checkup. An angiogram revealed that his bypasses and stent were fine. It was determined that his blood pressure was low, so additional medication was prescribed for low blood pressure. The doctors fully released Freddie to return to work without any

restrictions, including traveling. The next week, Freddie was back at work and traveling as always.

Freddie's Typical Schedule

17.    Freddie worked a full-time job, Monday through Friday, although his daily schedule depended on travel to a Caliber location or corporate office. His day could start as early as 5 a.m. If he was going into the office, he would leave the house between 6 and 7 a.m. He enjoyed winding down in the evenings with his Doberman and Chihuahua.

The Caliber Plan

18.    Caliber was founded in 1997 and has since grown to more than 1,700 centers nationwide. It is the nation's largest collision repair provider in the country, with collision repair centers in 41 states. Caliber consistently ranks among the highest customer satisfaction scores in the industry.

19.    Just as important, Caliber takes care of its 30,000 plus employees. It provides, among other things, health insurance, disability insurance, life insurance, and Accidental Death and Dismemberment ("AD&D") insurance.

20.    As a full-time employee at Caliber, Freddie enrolled in the Caliber Holdings LLC Employee Benefits Plan ("Plan") that included AD&D benefits. The Plan was part of Caliber's group insurance policy insured by Lincoln. It was designed to pay a benefit if Freddie was seriously injured or died in a covered accident and experienced a covered loss.

21.    The Summary Plan Description ("SPD") had an effective date of January 1, 2023.

22.    The Plan Administrator is Caliber Holdings LLC.

23. The SPD states in part, "Caliber Holdings LLC reserves the right to change, amend, suspend, or terminate any or all of the benefits under this Plan, in whole or in part, with or without notice, at any time and for any reason at its sole discretion."

24. There is no Administrative Services Agreement between Caliber and Lincoln.

Freddie's Accidental Death

25. Around 5:00 a.m. on February 15, 2023, Mrs. Smith was woken up by Freddie yelling. She hurried to the kitchen, where he was standing in front of a coffee maker.

26. Freddie told his wife that he fell in the kitchen.

27. He had a scratch on top of his head and a scratch on his forehead.

28. Mrs. Smith checked him, got peroxide to clean his two scratches, and did not see any swelling or active bleeding. She checked his blood pressure, his oxygen level, and sugar. All vitals were normal, although his blood sugar was a little low, which was normal after a night of sleep.

29. After breakfast, Mrs. Smith again confirmed there was no swelling on Freddie's forehead.

30. Freddie left for work around 6:30 a.m. He drove himself to work.[1]

31. While at work, Freddie began to feel numbness in his left leg from the knee down. He could not move his left leg. He called his wife to take him to the hospital.

32. Freddie was admitted to Texas Health Denton Emergency Room at 12:42 p.m. At that time, he reported that he got up to go to the bathroom at 3 a.m., where he

---

[1] The video of these events was provided to Lincoln on December 15, 2023.

passed out for one to two minutes. Freddie also stated that his wife heard the fall and found him on the bathroom floor.

33.  On February 16, Freddie underwent a right fronto-parietal craniotomy to evaluate a subdural hematoma and reduce brain swelling.

34.  However, Freddie did not recover from the fall. He was intubated to help with breathing. On February 18, he was discharged to hospice care.

35.  Freddie Smith died on February 19, 2023.

Investigation and Cause of Death

36.  Dr. Richard Fries, a deputy medical examiner in Tarrant County, investigated the cause of death. He finalized the Death Certificate on February 22, 2023.

37.  Dr. Fries listed "blunt head injury" as the Cause of Death. He noted that the manner of death was accident. The manner of injury was described as a "fall." He did not list hypotension, Von Willebrand disease, or any other conditions as  the cause of death. Dr. Fries also confirmed that no other significant conditions contributed to Mr. Smith's death:



The Claim

38.  Mrs. Smith submitted life insurance and AD&D claims to Lincoln in March 2023. Lincon paid the life insurance claims.

39.  In a March 15, 2023 letter, Lincoln quoted several exclusions in the Policy and asked Mrs. Smith if she wanted to withdraw the AD&D application.

6

40.   Lincoln medical director Peggy Geimer reviewed the claim in early April. She concluded that orthostatic hypotension, heart disease, Von Willebrand, and the use of Plavix and aspirin "caused or contributed to the fall."

41.   Fourteen days later, Lincoln denied the claim. In doing so, it contended that Freddie's death was "caused or contributed to by disease, bodily, or mental illness".

The Appeal

42.   Mrs. Smith and Caliber hired Hunton Andrews Kurth to assist in the appeal. In June 2023, they appealed Lincoln's wrongful denial of her claim. Among other things, they pointed out that Lincoln (1) did not identify who purportedly reviewed Mr. Smith's medical records and (2) did not provide evidence pursuant to Texas law that an illness was the proximate cause of death.

43.   They pointed out that for a disease exclusion to apply, the disease, bodily or mental illness must have been a proximate cause of Freddie's death, *Fowler v, Peoples Benefit Life Ins, Co,*, No, 3:06-cv-1095-L, 2007 WL 2229053, at *6 (N.D. Tex. Aug, 3, 2007) (similar disease exclusion did not preclude AD&D benefits where there was uncertainty amongst experts as to the extent obesity and diabetes contributed to decedent's death); *see also Wells v. Minn. Life Ins. Co.*, 885 F,3d 885, 896 (5th Cir, 2018) (even broader disease exclusion did not preclude AD&D benefits because insured's hypertension was not a proximate cause of his death).

44.   Under Texas law, Lincoln had to prove that any disease, bodily or mental illness was the "active, efficient, procuring cause" of Freddie's death, not a "cause of a cause.'"

45.   In response, Lincoln had another medical director review the file. Dr. Robert Millstein concluded that Freddie's death was caused by orthostatic hypotension

induced loss of consciousness resulting in head injury and subdural hematoma. He also concluded that Von Willbrand, aspirin, and Plavix contributed to his death.

46. On July 13, Hunton Andrews Kurth responded, noting that Dr. Millstein's report proved that Freddie's death was due to blunt force trauma, not disease. The only cause of death was a head injury, not hypotension. Further, Lincoln's own claim file admitted that Freddie was in "a normal state of health" until his fall.

47. Lincoln denied the appeal on August 2, 2023. In doing so, it contended that Freddie's fall was caused by him standing "rapidly while lying down".

Post Appeal Evidence

48. Mrs. Smith and Caliber hired the undersigned counsel to submit an appeal supplement.

49. On December 15, 2023, Mrs. Smith and Caliber submitted an appeal supplement. The additional evidence consisted of 9 exhibits, including two videos taken inside the Smith home on the morning of Freddie's fall. The evidence was submitted pursuant to Fifth Circuit case authority, which required Lincoln to review the additional evidence. *Vega v. National Life Ins. Services, Inc.*, 188 F.3d 287, 300 (5th Cir. 1999) ("The administrative record consists of relevant information made available to the administrator prior to the . . . filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it."). *Vega* has been repeatedly upheld by the 5th Circuit.

50. First, Mrs. Smith and Caliber pointed out that Lincoln's denial rests on its assumption that hypotension is a "disease or bodily illness" that "caused or contributed to" Freddie's death. It appears that Lincoln concludes that anyone who suffers from hypotension also has a "disease or bodily illness" that precludes

coverage for an accidental death. By this logic, anyone with low blood pressure is automatically excluded from coverage, which would automatically exclude millions of Americans over age 50.[2]

51.    Unwritten exclusions like these are illogical and unenforceable.

52.    Next, they noted that Lincoln never tried to contact the Tarrant County Medical Examiner, Dr. Richard Fries, or any of Freddie's medical providers, including the doctors who treated him in his final days after the fall.

53.    Third, they revealed Lincoln's reliance on biased and unqualified medical directors, underscoring its outcome-oriented review. Lincoln had Peggy Geimer and Robert Millstein review select portions of Freddie's medical records that supported its denial of Mrs. Smith's claim. Neither is a pathologist.

54.    Dr. Geimer holds herself out as board certified in occupational medicine. She is not licensed to practice medicine in Texas. She does not have hospital privileges. She does not actively see patients. She was unqualified to review this claim, which had nothing to do with the treatment of work-related illnesses.

55.    Dr. Geimer does, however, have a long history as a corporate medical director:

---

[2] Nearly 5% of adults over 50 in the United States have hypotension, and more than 30% in people over 70. https://my.clevelandclinic.org/health/diseases/21156-low-blood-pressure-hypotension



https://www.linkedin.com/in/peggy-geimer-1775154/

56.    Given this context, it is not surprising that Dr. Geimer opined that Freddie's low blood pressure "caused or contributed to his fall by causing a sudden drop in blood pressure when he rose from a supine position in his bed to a standing position." She also opined that previous heart surgery and Von Willebrand disease "caused or contributed to" the development of subdural hematoma. However, Dr. Geimer agreed that the death certificate listed the cause of death as "blunt force head injury." The injury occurred due to a fall. The manner of death was listed as accident. She made no attempt to argue with or rebut any of these conclusions.

57.    Dr. Millstein holds himself out as board certified in internal medicine. However, he is not licensed to practice medicine in Texas. He does not have privileges at any

hospital. He does not actively treat patients. Dr. Millstein has been a medical consultant since 2003 for Lincoln Financial group and its subsidiaries[3]:

**WORK EXPERIENCES**

| | |
|---|---|
| Medical Consultant, Disability Division of Lincoln Financial Group.-Dover, New Hampshire | 2019-present |
| Medical Consultant, individual and group life mortality assessment Division of Liberty Life, Lincoln financial and Protective insurance | 2015-present |
| Medical Consultant, Disability Division of Liberty Mutual Insurance Co.-Dover, New Hampshire | 2003-2019 |

58. Liberty Mutual previously admitted that Dr. Millstein does not see patients in *DeGennaro v. Liberty Life Assur. Co. of Boston* 2008 WL 2485525, 3 (W.D.Mich.) (W.D.Mich.,2008) ("Liberty Life's appeal consultant forwarded these records along with the rest of Ms. DeGennaro's file to another physician consultant, Dr. Robert Millstein. Dr. Millstein does not have an active patient practice but rather works exclusively for Liberty Life. [Factual Stipulation, Doc. 17].")

59. Dr. Millstein's review was biased and based on incomplete and inaccurate information. He stated that on the morning of February 15, 2023, Freddie "got up too quickly going to the bathroom, which caused him to lose consciousness for 1-2 minutes." This statement is rebutted by Mrs. Smith and the video evidence, which shows that 1) Freddie got up that morning to go to the kitchen, 2) he was in the kitchen, not the bathroom, 3) there is no evidence that he fell due to hypotension, 4) Mrs. Smith rushed to the kitchen quickly, and 5) by the time she got there,

---

[3] Lincoln Financial Group finalized its purchase of Liberty Life Assurance Company of Boston on May 1, 2018.

Freddie was already making his coffee. This subverts Dr. Millstein's theory that Freddie ran to the bathroom at night, then blacked out from low blood pressure.

60.    However, Lincoln ignored other parts of Dr. Millstein's report that supported coverage. Dr. Millstein, like Dr. Geimer, agreed that Freddie fell and suffered acute subdural hematoma. An acute subdural hematoma is a serious condition where blood collects between the skull and the brain's surface. It carries a "high risk of death, particularly in older people."[4] Lincoln should not have ignored this conclusion from Dr. Millstein because an acute subdural hematoma, in and of itself, is highly likely to be fatal. This medical conclusion is further supported by the Tarrant County Medical Examiner.

61.    Finally, Mrs. Smith and Caliber pointed out that Lincoln ignored credible evidence from an unbiased and highly qualified source - the Tarrant County Medical Examiner.

62.    The Tarrant County Medical Examiner's District serves four counties (Tarrant, Parker, Denton, and Johnson) in Texas, with a combined population exceeding three million people. It is governed and legislated by Section 49.25 of the Texas Code of Criminal Procedure. The Tarrant County Medical Examiner's District identifies and explains both the cause and manner of death in cases where the death has occurred unattended or unexplained, or where the death is due to unnatural causes. The Medical Examiner division is accredited by the National Association of Medical Examiners and the Accreditation Council for Graduate Medical Education.

---

[4] https://www.nhs.uk/conditions/subdural-haematoma/

63. Dr. Richard Fries is licensed to practice medicine in Texas and is double board certified in pathology and forensic pathology. He is a deputy medical examiner in Tarrant County. Medical examiners are physicians specially trained in forensic pathology to determine cause and manner of death of individuals who die suddenly, unexpectedly, or violently. The presence or absence of disease, injury, or poisoning is ascertained by examination, as well as by evaluating collected evidence and historical and law enforcement investigative information. Medical examiners utilize data obtained from traditional medicine, pathology, toxicology, radiology, wound ballistics, trace evidence, forensic serology, and DNA technology to establish the cause and manner of death.[5]

64. Since 2007, Texas Health and Safety Code §193.005 has required medical certifiers of a death certificate to submit a medical certification and attest to its validity using an electronic process approved by the State Registrar.

65. The conclusions in a death certificate are not mere speculation to be discarded by Lincoln: they are legally binding.

66. It is thus important to understand the medical and legal definition of a cause of death. The Harris County Institute of Forensic Sciences define the terms as follows:

**Cause of Death** - the injury responsible for the lethal sequence of events.

**Manner of Death** explains how the cause of death arose: a natural vs. violent death. Natural deaths are caused exclusively by disease. If an injury of any sort (mechanical, chemical, electrical, etc.) causes or contributes to death, the fatality is classified as non-natural and then is sub-classified as Accident, Homicide, Suicide or Undetermined.

**Accident** – "there is little or no evidence that the injury or poisoning occurred with intent to harm or cause death. In essence, the fatal outcome was

---

[5] https://www.tarrantcountytx.gov/en/medical-examiner/about-the-medical-examiner.html

unintentional". Some examples of Accidental death are: accidental overdose, falls, motor vehicle accidents, etc.[6]

67.    The death certificate was medically and legally significant in arriving at the cause of Freddie's death. By listing "blunt head injury" as the Cause of Death, Dr. Fries concluded that the head injury was responsible for Freddie's death. He noted that the manner of death was accident; the fatal outcome was unintentional. If he had concluded that hypotension, Von Willebrand disease, or other conditions were the cause of death, he would have listed the manner of death as natural (death caused exclusively by disease). To avoid confusion, he also clarified that no other significant conditions contributed to Freddie's death. Finally, he described the injury clearly as a "fall."

68.    If Lincoln was confused by Dr. Fries' conclusions as to the cause of death, Lincoln should have contacted Dr. Fries before denying this claim to better understand why he concluded that Freddie's death was caused by blunt head injury. How severe was the injury? Was the blunt head trauma the direct and sole cause of Freddie's death? If something else caused or contributed to his death, was it a direct cause or merely a cause of a cause?

69.    Lincoln never contacted Dr. Fries and, instead, ignored his findings as set forth in the death certificate.

Applying Texas Law to the Claim

70.    Mrs. Smith and Caliber even explained Texas law to Lincoln. The Texas Supreme Court addressed the question of how to interpret an insurance policy exclusion like

---

[6] https://ifs.harriscountytx.gov/Pages/Glossary.aspx#accident

the one here. In *Stroburg v. Insurance Company of North America*, 464 S.W.2d 827, 831-832 (Tex. 1971), the Texas Supreme Court recognized two types of exclusion clauses: (1) those which excluded coverage only when disease was a proximate cause, and (2) those which also excluded it when disease was a more remote cause of the loss. Lincoln's policy exclusion falls into the first category.

71.    Regarding an exclusion like the one Lincoln relies on in this case (i.e., where a disease "caused or contributed to" the loss), the Texas Supreme Court held:

> We hold that the provision excludes liability for losses from the itemized risks in "D" *only when such risks are a proximate as distinguished from an indirect or remote cause of the loss*. The instant policy does not exclude loss caused "directly or indirectly" by illness, disease, etc., and the evidence does not establish conclusively that disease was a proximate cause of the death of the insured.

72.    The same issue was decided by the Fourteenth District Court of Appeals in Houston three years later, in which the policy required that the accident be the independent cause of death. The exclusion was construed to require a showing that the accident was the sole proximate cause. *Mutual Benefit Health Accident Ass'n v. Hudman*, 398 S.W.2d 110, 112 (Tex. Sup. 1965). Importantly, recovery of benefits is not defeated by a preexisting condition or disorder that is so remote in the chain of causation that it does not materially contribute to a death or injury. *Stroburg v. Insurance Company of North America*, 464 S.W.2d 827, 829 (Tex.Sup. 1971); *Hudman* at 114. The court thus found that an insured who might have suffered a seizure while bathing died by accidental means because "epilepsy may have caused the accident, i.e. the fall, but it did not cause the death by drowning." The fact that death comes about in a way that is not a "natural and probable consequence" of the hazards of the disease permits the conclusion that it

is caused by accidental means. *Seaboard Life Ins. Co. v. Murphy*, 132 S.W.2d 393, 395 (Tex. Comm'nApp. 1939). The epilepsy was simply a "cause of a cause." *Natl'l Life v. Franklin*, 506 S.W.2d 765, 767 (Tex. Civ. App. 1974).

73.    Applying these longstanding principles to this claim, Mrs. Smith and Caliber explained that Lincoln must establish that Freddie's health conditions caused his death, not that they caused the accident that ultimately led to his death. Lincoln admittedly cannot meet this burden although it tries, albeit unsuccessfully, by stating that Freddie's hypotension and bleeding disorder "were significant factors in the development of subdural hematoma." This ignores the fall that caused the subdural hematoma.

74.    An exclusion cannot exclude losses that are indirectly caused by a disease. *Mutual Benefit Health & Accident Association v. Hudman*, 398 S.W.2d 110, 114 (Tex. 1965) ("Recovery is not defeated when a preexisting condition or disorder is so remote in the scale of causation, so dormant and insubstantial, or so temporary and transient that it does not materially contribute to the death or injury.").[7]

Lincoln's Lack of Discretion to Decide the Claim

75.    Caliber is the Plan Administrator of the Plan.

76.    Both Mrs. Smith and Caliber asked Lincoln to provide a complete copy of any Administrative Services Agreement between Caliber Holdings LLC and Lincoln National that relates to the administration of AD&D claims in 2023.

77.    On November 1, 2023, Lincoln refused to provide any Administrative Services Agreement between Caliber and Lincoln. Lincoln employee Lindsay Mack first

---

[7] Another example of Lincoln's conduct in this regard is its tortured focus on Freddie taking aspirin, an over-the-counter drug used by millions of Americans daily.

claimed that no such document existed. In the very next sentence, she asked Mrs. Smith and Caliber to request the document – "if such document exists" – from Caliber Holdings LLC.

78.    Since Lincoln is unable to produce an Administrative Services Agreement between Caliber and Lincoln that relates to the administration of AD&D claims, it cannot prove that it has any discretionary authority to decide this claim. Moreover, it has not identified any contract between Caliber and Lincoln that gives it discretion to decide this claim.

79.    In response, Lincoln simply cited the discretionary clause in its own Policy. However, that clause is unenforceable. Texas has banned the use of discretionary clauses in insurance policies issued in this state. Tex. Ins. Code §1701.062; 28 Tex. Admin. Code §3.1202. This applies to any Plan or SPD that Lincoln contends contains a discretionary clause.

80.    In its role as Plan Administrator, Caliber has repeatedly ordered Lincoln to approve Mrs. Smith's claim. Lincoln has refused to do so.

81.    Lincoln has not, and cannot, demonstrate that it has the final authority to decide claims or appeals under the Caliber Holdings LLC Plan.

                    Expert Report from Independent Emergency Room Physician

82.    Finally, Mrs. Smith and Caliber incurred the expense of retaining an independent medical opinion on Freddie's cause of death. That expert was Dr. Akash Bhagat.

83.    Dr. Bhagat attended the University of North Texas Health Science Center in Ft. Worth for medical training, then completed his residency in Emergency Medicine at Texas Tech Medical Center. During his residency, Dr. Bhagat was nominated to be a board member of the Texas College of Emergency Physicians and was also

nominated to the Chief Resident post in his final year of practice at Texas Tech. He is a Fellow of the American Academy of Emergency Medicine, Board Certified in Emergency Medicine, and is licensed to practice medicine in Texas.

84.    Dr. Bhagat has extensive experience as an Emergency Room physician at numerous hospitals in Houston. He also practices Emergency Medicine at several free–standing Emergency Centers in Houston and is a supervising physician and co-founder of an Urgent Care Clinic.

85.    Dr. Bhagat knows the diagnosis, treatment, prognosis, standard of care, and clinical outcomes for patients who have suffered from blunt head injury. Unlike Lincoln's medical directors, he has the expertise and knowledge to render opinions regarding Freddie's death.

86.    Dr. Bhagat reviewed the following records:

> a. Death Certificate (1 page)
> b. Emergency Room records (66 pages)
> c. August 2, 2023 Appeal Denial Letter by Lincoln (11 pages)
> d. Medical Record Review by Peggy Geimer, M.D. (4 pages)
> e. Medical Record Review by Robert Millstein, M.D. (10 Pages)

87.    Based on that review, Dr. Bhagat concluded that Freddie's fall was medically significant:

> By the time Mr. Smith sought medical attention on the afternoon of February 15, 2023, a critical situation had already begun to unfold within his body. The fall he experienced earlier in the kitchen, which led to him striking his head, was not a minor incident. This event initiated a cascade of medical complications. The impact from the fall caused a subdural hematoma - a collection of blood between the covering of the brain and its surface. This hematoma was insidiously expanding, exerting increasing pressure within the confines of his skull. Such pressure is particularly dangerous, as it can lead to brain damage, and in severe cases, can be life-threatening.

88.    Responding to Lincoln's claims that hypotension caused the fall, Dr. Bhagat researched the medications that Freddie was taking. He noted that Midodrine is

the "single most effective pharmacologic intervention for orthostatic hypotension" because it creates arteriolar and venular constriction, which has the same effect on standing and supine blood pressure. Since it does not cross the blood-brain barrier, it does not directly affect cardiac function. In short, the efficacy of Midodrine made any fall due to hypotension unlikely.

89.    Dr. Bhagat also addressed Lincoln's claims that disease, bodily, or mental illness caused or contributed to Freddie's death. While the history of cardiovascular issues and use of aspirin and Plavix increased a risk of bleeding, Dr. Bhagat concluded that "they did not cause his death: the fall caused his death".

90.    Dr. Bhagat concluded as follows:

> Therefore, it is my opinion, within a reasonable degree of medical certainty, that the fall, resulting in the head injury and subsequent subdural hematoma, was the primary trigger for the cascade of medical events leading to Mr. Smith's untimely demise. At most, his underlying health conditions could be labeled a "cause of a cause".

91.    The unbroken chain of events that directly and solely caused Freddie's death was started by an accident – the fall.

### Exhaustion of Administrative Remedies

92.    Lincoln denied Mrs. Smith's appeal supplement on January 11, 2024.

93.    Lincoln responded to Dr. Bhagat's expert report on January 26, 2024. It continued to deny the claim.

94.    Having exhausted all administrative remedies, Nanette Smith and Caliber Holdings LLC bring this action to recover the $500,000 in AD&D benefits that Mrs. Smith is entitled to under the Policy.

## Claims and Causes of Action

95.  The Caliber Holdings LLC Employee Benefits Plan ("Plan") is governed by ERISA. 29 U.S.C. §1001, *et. seq*. Caliber is the plan sponsor and Plan Administrator. Lincoln is the insurer and a Plan fiduciary.

96.  As Plan fiduciary, Lincoln is obligated to handle claims for the benefit of the Plan and Plan beneficiaries, and to deliver the benefits promised in the Plan. It is also obligated as a fiduciary to conduct its investigation of a claim in a fair, objective, and evenhanded manner.

97.  Lincoln's adjustment or "adjudication" of Mrs. Smith's claim was instead biased and outcome oriented. This was in part reflected by its denial of Mrs. Smith's claim, even after being presented with evidence that the unbroken chain of events that directly and solely caused Freddie's death was started by an accident – the fall. It was also reflected in Lincoln's unreasonable decision to rely on its own unqualified and biased employees, Peggy Geimer and Robet Millstein.

98.  Lincoln's interpretation of the Policy and its terms was not legally correct. It was also contrary to a plain reading of the Policy language.

99.  Lincoln's interpretation of the Policy and its terms was contrary to that of the average Plan participant and policyholder. It was contrary to the common and ordinary usage of the Policy terms. Alternatively, the Policy language upon which Lincoln based its denial decision was vague and ambiguous, which requires that they be construed against Lincoln and in favor of coverage for Mrs. Smith.

100.  Lincoln's denial was made without substantial supporting evidence. Its decision to deny Mrs. Smith's claim was instead based upon rank speculation and guesswork. Lincoln's denial decision was *de novo* wrong. Alternatively, it was arbitrary and capricious.

101.   The decision-making process did not comport with 29 U.S.C. §1133's requirement that any notice of the denial must contain the specific reasons for such denial, written in a manner calculated to be understood by the participant, and must comport with the Department of Labor Regulations.

102.   The decision-making process did not provide a reasonable opportunity to Mrs. Smith and Caliber for a full and fair review of the decision denying the claim, as is required by 29 U.S.C. §1133 and 29 C.F.R. 2560.503-1.

103.   Among other things, Lincoln refused to comply with the Plan Administrator's explicit orders regarding this claim. In its role as Plan Administrator, Caliber has repeatedly ordered Lincoln to approve Mrs. Smith's claim. Lincoln has refused to do so, even though it cannot prove that it has any authority to decide this claim. Lincoln has thus breached its contract with Caliber.

104.   The appellate procedures did not provide Mrs. Smith with a full and fair review. Among other things, Lincoln ignored the evidence that Mrs. Smith and Caliber submitted on appeal. It did not provide that evidence to the people it relied upon to deny the appeal. The people it relied upon lacked the credentials, qualifications, and experience to properly review Mrs. Smith's claim.

105.   Lincoln's denial of Mrs. Smith's claim breached the Policy, as well as any contract between Caliber and Lincoln. This breach violated 29 U.S.C. §1132(a)(1), entitling Mrs. Smith to the $500,000 in AD&D benefits to which she is entitled under the Plan, along with pre-judgment interest on the amounts due and unpaid, plus attorneys' fees, all for which Plaintiffs now sue.

**Standard of Review**

106. The default standard of review for denial of a benefit claim is *de novo*. Where the Plan or Policy confers discretion on the Claims Administrator, an abuse of discretion standard of review may apply.

107. Lincoln cannot demonstrate that it has any authority to decide this claim. The Plan Administrator, Caliber, has repeatedly demanded that Lincoln approve the claim and pay Mrs. Smith the AD&D benefits.

108. The Plan or Policy may contain a discretionary clause or language Lincoln may construe as affording it discretion to determine eligibility for benefits, interpret the terms of the Policy, and determine the facts. Lincoln's denial under this standard of review, if any, was an abuse of discretion. It was arbitrary and capricious.

109. Alternatively, the standard of review of this claim should be *de novo,* affording Lincoln no discretion in its interpretation of the terms of the Policy and Plan or in its factual determinations. Both factual conclusions and legal determinations are reviewed *de novo* by the Court. *Ariana v. Humana Health Plan of Texas, Inc*., 884 F.3d 246 (5th Cir. 2018).

110. The Plan or Policy was delivered in Texas and is subject to the laws of that jurisdiction. Texas law applies under the ERISA savings clause. Texas has banned the use of discretionary clauses in insurance policies issued in this state. Tex. Ins. Code §1701.062; 28 Tex. Admin. Code §3.1202. Accordingly, review of Mrs. Smith's claim and Lincoln's claims handling conduct, both in its interpretation of terms of the Policy and the Plan, and in its determination of the facts, should be *de novo*.

### Request for Prejudgment Interest

111. Mrs. Smith requests, in addition to the benefits withheld, prejudgment interest on any such award. She is entitled to prejudgment interest as additional

compensation, and pursuant to TEX. INS. CODE §1103.104, or on principles of equity.

112.   The Policy does not contain a rate of interest payable on the benefit amount wrongfully withheld. Resort must be had to TEX. INS. CODE §1103.104(c).

113.   ERISA plaintiffs are authorized to obtain pre-judgment interest when calculating the total compensation amount for their claims. *Perez v. Bruister*, 823 F.3d 250, 274 (5th Cir. 2016) ("Prejudgment interest is available in ERISA cases."); *Whitfield v. Lindemann*, 853 F.2d 1298, 1306 (5th Cir. 1988) ("It is not awarded as a penalty, but of as compensation for use of the funds."). Pre-judgment interest furthers ERISA's purpose. *City Milwaukee v. Cement Div., Nat'l Gypsum Co*., 515 U.S. 189, (1995) (The "essential rationale for awarding pre-judgment interest is to ensure that an injured party is fully compensated for its loss.").

114.   Because ERISA does not mandate a rate for pre-judgment interest, state law determines the applicable interest rate. *Perez v. Bruister*, 823 F.3d 250, 274 (5th Cir. 2016). In the alternative to the Texas Insurance Code, pre-judgment interest may be calculated under Texas Finance Code Ch. 304. *Arete Partners, LP v. Gunnerman*, 643 F.3d 410, 414-15, (5th Cir. 2011). Accrual of interest starts on (1) the 180th day after a defendant receives written notice of claim or (2) the date suit is filed, whichever is earlier. Tex. Fin. Code Ann. §304.003(c), 304.104. Accrual of interest ends on the day preceding the judgment, at the prime rate of 5% per year if the prime rate if less than 5%. *Id*.

### Claim for Attorneys' Fees and Costs

115.   Mrs. Smith and Caliber seek an award of their reasonable attorneys' fees incurred and to be incurred in the prosecution of this claim for benefits. They are entitled to

recover those fees, together with their costs of court, pursuant to 29 U.S.C. §1132(g).

116.    The court may award attorneys' fees when it "can fairly call the outcome of the litigation some success on the merits without conducting a lengthy inquiry". *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 255 (2010).

## **Prayer**

Nanette Smith and Caliber Holdings LLC, Plaintiffs, request that upon trial of this matter or other final disposition, this Court find in their favor and issue judgment against Defendant The Lincoln National Life Insurance Company as follows:

A.    Pay to Mrs. Smith no less than $500,000 in AD&D benefits due and owing in accordance with the terms of the Plan and Policy, as well as all prejudgment interest due thereon and as allowed by law and equitable principles;

a.    For an order enjoining Lincoln from any further breaches of fiduciary or co-fiduciary duties in all Caliber Holding LLC claims; or in the alternative, for the Court to remove Lincoln from its fiduciary roles in the administration of the Plan, and to appoint a special master to substitute for Lincoln with the special master having the authority to make all determinations as to all Caliber Holding LLC AD&D claims insured by Lincoln;

B.    Pay all reasonable attorney's fees incurred and to be incurred by Plaintiffs in obtaining the relief sought herein, along with the costs associated with the prosecution of this matter; and

C.    All such other relief, whether at law or in equity, to which Plaintiffs may show themselves justly entitled.

Respectfully submitted,

By:_____ */s/ Amar Raval*_____
        Amar Raval, TBA #24046682
        S.D. No. 619209
        Berg Plummer Johnson & Raval LLP
        3700 Buffalo Speedway, Suite 1150
        Houston, TX 77098
        (713) 526-0200
        (832) 615-2665 (Fax)
        araval@bergplummer.com

        ATTORNEYS FOR PLAINTIFFS